IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COLUMBIA

CHARNAN WILLIAMS,

*Plaintiff*,

v.

TRUSTEES OF DARTMOUTH COLLEGE
d/b/a DARTMOUTH COLLEGE,
DARRIN MCMAHON, individually,
MATTHEW DELMONT, individually,
BENJAMIN VALENTINO, individually, and
ELIZABETH SMITH, individually,

*Defendants*.

Civil Action No. _____

**(JURY TRIAL DEMANDED)**

**COMPLAINT**

**INTRODUCTION**

1.    Plaintiff Charnan Williams ("Dr. Williams") brings this action against the Trustees of Dartmouth College ("Dartmouth") and Defendants Darrin McMahon, Matthew Delmont, Benjamin Valentino, and Elizabeth Smith (collectively, "Individual Defendants") for race discrimination, sex discrimination, retaliation, hostile work environment, conspiracy to deprive Dr. Williams of her civil rights, civil conspiracy, breach of the implied covenant of good faith and fair dealing, breach of institutional policies, and intentional infliction of emotional distress arising from Defendants' coordinated campaign to terminate Dr. Williams's employment and destroy her academic career.

1

2.      Dr. Williams is an African American woman who served as a postdoctoral fellow at Dartmouth beginning in July 2023 under a two-year appointment that, by its terms and by Dartmouth's established practice, was to transition into a tenure-track assistant professor position. Over the course of approximately two years, Defendants subjected Dr. Williams to pervasive racial and gender discrimination, manufactured pretextual grounds to terminate her appointment, obstructed her contractual teaching obligations, deliberately misrepresented her scholarly productivity in an annual review, excluded her from departmental events and scholarly opportunities afforded to her non-African American peers, and retaliated against her for asserting her rights and for her spouse's protected complaints.

3.      Defendants' discriminatory and retaliatory conduct culminated on May 29, 2025, when the Dean of Faculty terminated Dr. Williams's appointment—one day after Dartmouth finally approved the very course it had spent months obstructing—without affording Dr. Williams the grievance procedures guaranteed to similarly situated tenure-track faculty under the Organization of the General Faculty of Dartmouth College.

4.      During her appointment, Dr. Williams performed a substantial portion of her contractual duties in the District of Columbia, where she conducted archival research, engaged in scholarly activity, and worked remotely in furtherance of her appointment. Key discriminatory communications and decisions by Defendants were directed at and received by Dr. Williams in the District of Columbia.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e et seq., Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., and 42 U.S.C. § 1985(3).

6.     This Court has supplemental jurisdiction over Plaintiff's state-law and common-law claims under 28 U.S.C. § 1367 because they arise from a common nucleus of operative fact with Plaintiff's federal claims.

7.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia. Dr. Williams performed a substantial portion of her contractual obligations, including archival research and scholarly work—while working remotely in the District of Columbia. Discriminatory and retaliatory communications from Defendants were directed at and received by Dr. Williams in the District of Columbia.

8.     Plaintiff has exhausted her administrative remedies under Title VII. Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Notice of Right to Sue on January 29, 2026. A copy of the notice of the right to sue is attached as **Exhibit A**. This action is filed within ninety (90) days of Plaintiff's receipt of that notice.

## PARTIES

9.     Plaintiff Dr. Charnan Williams is an African American woman and a citizen of the District of Columbia who, at all relevant times, resided and worked in the District of Columbia and the Upper Valley region of Vermont and New Hampshire. At all relevant times, Dr. Williams was employed by Dartmouth College as a postdoctoral fellow with a contractual right to transition

into a tenure-track assistant professor position in the Department of History. Dr. Williams performed a substantial portion of her scholarly and research obligations remotely from the District of Columbia.

10.     Defendant Trustees of Dartmouth College ("Dartmouth") is a private university incorporated in New Hampshire with its principal place of business at 63 South Main Street Suite 301, Hanover, New Hampshire, 03755. Dartmouth is an *employer* within the meaning of Title VII, 42 U.S.C. § 2000e(b), and employs fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and is a recipient of federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681(a). Dartmouth regularly transacts business in the District of Columbia and maintains substantial, continuous contacts with the District. Among other things, Dartmouth operates a Washington, D.C. campus program through which students enroll in coursework and participate in experiential learning placements in the District. Dartmouth also maintains a federal-relations operation that conducts institutional advocacy directed at Congress and federal agencies in Washington, D.C. Upon information and belief, Dartmouth employs staff, engages consultants, or maintains office space in the District of Columbia in connection with these programs. Dr. Williams performed a substantial portion of her scholarly and research obligations from the District of Columbia with Dartmouth's knowledge and acquiescence.

11.     Defendant Darrin McMahon ("McMahon") is an individual who, at all relevant times, served as Chair of the History Department at Dartmouth College. McMahon is sued in his individual capacity for his role in the conspiracy, breach of contract, and intentional infliction of emotional distress alleged herein.

4

12. Defendant Matthew Delmont ("Delmont") is an individual who, at all relevant times, served as Associate Dean of Interdisciplinary Studies at Dartmouth College and as Chair of the Department of African and African American Studies ("AAAS"). Delmont is sued in his individual capacity for his role in the conspiracy and intentional infliction of emotional distress alleged herein.

13. Defendant Benjamin Valentino ("Valentino") is an individual who, at all relevant times, served as Associate Dean of Social Sciences at Dartmouth College. Valentino is sued in his individual capacity for his role in the conspiracy and intentional infliction of emotional distress alleged herein.

14. Defendant Elizabeth Smith ("Smith") is an individual who, at all relevant times, served as Dean of Faculty at Dartmouth College. Smith is sued in her individual capacity for her role in the conspiracy and intentional infliction of emotional distress alleged herein.

## FACTUAL ALLEGATIONS

### A. Dr. Williams's Appointment and Contractual Rights

15. In or about 2023, Dartmouth offered Dr. Williams a two-year postdoctoral fellowship in the Department of History, commencing in July 2023, with a contractual commitment to transition into a tenure-track assistant professor position upon completion of the fellowship.

16. Dr. Williams's appointment letter did not characterize her postdoctoral fellowship as probationary. No provision of her contract authorized Dartmouth to treat the fellowship period as probationary or to terminate the appointment without cause prior to the contractual transition to assistant professor.

5

17. According to Dartmouth's established practice, postdoctoral fellows who are promised tenure-track lines are considered tenure-track assistant professors upon hire. On May 8, 2020, Dartmouth's Director of Fellowships, Israel Reyes, confirmed this practice in an email to Dr. Williams's husband, Dr. Marvin Chochotte—himself then a postdoctoral fellow at Dartmouth—stating that despite being a postdoctoral fellow, Dr. Chochotte was "technically" a tenure-track professor. Dr. Chochotte is a male.

18. Under the Organization of the General Faculty of Dartmouth College, Section 5, tenure-track faculty members are entitled to grievance procedures before termination, including those described in the Agreement Concerning Academic Freedom, Tenure, and Responsibility of Faculty Members. Dr. Williams was denied these procedures.

**B. Gender Discrimination and Harassment by McMahon**

19. On October 11, 2023, Dr. Williams met with McMahon in his office. During that meeting, McMahon told Dr. Williams that he viewed her as a "daughter" and himself as a "father figure" toward her. McMahon's gendered, paternalistic framing established an unequal dynamic that characterized his subsequent treatment of Dr. Williams throughout her appointment.

20. During the same October 11, 2023 meeting, McMahon encouraged Dr. Williams to focus on archival research and travel to increase her research profile. McMahon stated that the History Department expected junior faculty to produce "five articles" to meet tenure standards and advised Dr. Williams to use her postdoctoral fellowship to get a head start on publishing. Dr. Williams followed this advice, performing substantial archival research in the District of Columbia.

21. On October 18, 2023, Dr. Williams attended a dinner related to an academic talk. During the dinner, McMahon made sexually inappropriate comments in Dr. Williams's presence,

including describing having caught his European exchange student engaged in a threesome at his home in Connecticut. These comments made Dr. Williams uncomfortable.

22. On October 13, 2023, McMahon requested that Dr. Williams teach "Race and Slavery from the Revolution to Emancipation." Dr. Williams confirmed she would teach the course on October 15, 2023.

23. On November 7, 2023, McMahon requested that Dr. Williams teach "Race and Slavery" in the Winter of 2025. Dr. Williams agreed. This satisfied her postdoctoral contractual obligation to coordinate with the chair to establish the one course she would teach in the second year of her fellowship.

24. On December 15, 2023, McMahon asked Dr. Williams to change the term she would teach from Winter to Spring 2025. Although Dr. Williams found this request unusual, she agreed. This was Dr. Williams's second confirmation of her teaching plans.

25. On January 24, 2024, Dr. Williams submitted the "2025-2026 History Teaching Schedule Request Form," indicating she would teach "History 16.2 Race and Slavery in US History" in the Spring of 2025 and specifying her full 2025–2026 teaching schedule, including designating Fall 2025 as her "R Term" (Residential Term). Dr. Williams received a receipt confirming the History Department's successful receipt of the form. This constituted Dr. Williams's third confirmation of her teaching plans to the chair, department administrator, and senior colleagues.

26. On March 19, 2024, the Vice Chair of the History Department confirmed by email that Dr. Williams's course was successfully approved to be taught in the Spring term of 2025. This was the fourth confirmation of the course.

27.     In approximately April 2024, McMahon went on leave. During his absence, the interim chair recommended splitting the course into two independent courses, allowing Dr. Williams independent rights to teach her portion. Dr. Williams created an entirely new syllabus and submitted the course for departmental approval.

28.     On September 19, 2024, the History Department curriculum committee approved Dr. Williams's course, and Dr. Williams submitted the required paperwork, including the syllabus and course description. This constituted the fifth confirmation of her course for Spring 2025.

29.     Upon McMahon's return as chair, he overhauled Dr. Williams's course in retaliation for her refusal to change her teaching term back to Winter. McMahon ignored nearly a year of approvals and paperwork, overhauled the course content, and sent it through a bureaucratic process designed to prevent the course from being approved by the start of the Spring 2025 term. On information and belief, no other junior faculty member received similar treatment.

30.     On September 24, 2024, McMahon's department administrator sent Dr. Williams an email marked with urgency at approximately 3:45 p.m., pressuring her to rearrange her schedule yet again. Dr. Williams reminded McMahon that she had already confirmed the Spring 2025 term. As set forth below, this email was sent approximately thirty-three minutes after Defendant Delmont pressured Dr. Williams's husband, Dr. Chochotte, regarding a departmental vote, reflecting coordinated retaliatory conduct by McMahon and Delmont.

31.     On November 12, 2024, McMahon informed Dr. Williams that, in consultation with Defendant Delmont, he intended to overhaul her new course and reattach her to the original "Race and Slavery" course. McMahon instructed Dr. Williams to coordinate with two additional male professors to establish her schedule, further complicating and obstructing her teaching obligations. McMahon justified this by stating that the course instructor would need to teach the Civil

War, despite the fact that Dr. Williams was the only proposed faculty member with expertise in Civil War history.

**C. Harassment and Course Obstruction by Delmont and Valentino**

32.    On December 2, 2024, Defendant Delmont sent a text message to Dr. Williams's personal cell phone, addressing Dr. Williams's husband. Delmont had been informed on February 15, 2023, that the number belonged to Dr. Williams, and on March 9, 2023, Delmont confirmed to Dr. Williams that he had her CV with her cell phone number. On information and belief, Delmont intentionally texted Dr. Williams's personal phone as part of a coordinated campaign of harassment initiated by McMahon.

33.    On December 4, 2024, Delmont emailed Dr. Williams directly, informing her that he would now be involved in overhauling her future course as assistant professor, disregarding her year-long efforts to revise and obtain approval for the course.

34.    On January 17, 2025, McMahon informed Dr. Williams that he would schedule her courses for 2025–2026, disregarding her previously submitted Teaching Schedule Request Form. McMahon also demanded her syllabus for Fall 2025, despite the form clearly designating Fall 2025 as her R Term. McMahon declared that he had enlisted Delmont and other administrators to continue emailing Dr. Williams about questions she had already answered.

35.    On January 17, 2025, Defendant Valentino sent Dr. Williams harassing communications. On the same date, another faculty member, Michelle Warren, informed Dr. Williams that Valentino had enlisted her to email Dr. Williams about questions already answered, further contributing to the hostile work environment.

36.     On January 22, 2025, the Dartmouth Course Approval Routing System ("DCARS") designated Dr. Williams's already-approved course "Early America and African American History: From the Colonial Era to the Gold Rush" for "deletion," removing it from the course catalogue and making it unavailable for student registration or for Dr. Williams to teach.

37.     On January 23, 2025, Valentino sent Dr. Williams a harassing text message to her personal cell phone. The volume and nature of communications from McMahon, Delmont, and Valentino compelled Dr. Williams to change her cell phone number on January 23, 2025.

38.     On February 4, 2025, Valentino sent another email falsely claiming that Dr. Williams had not confirmed her teaching for Spring 2025 or for the 2025–2026 academic year, despite Dr. Williams's multiple prior confirmations.

39.     On February 25, 2025, Delmont, in his capacity as chair of the African and African American Studies Department, "tabled" the approval of Dr. Williams's course, further obstructing her from fulfilling her contractual teaching obligations. Delmont justified the action by claiming that no one was present at the meeting who had the expertise to evaluate Dr. Williams' course, despite the overlapping expertise between the two scholars (i.e., Delmont and Charnan).

**D. Racial Discrimination**

40.     Dr. Williams is the only African American junior faculty member in her postdoctoral cohort in the History Department. Her cohort members and other junior faculty peers—including but not limited to Aseel Najib, Ernesto Mercado-Montero, and Charles Baldwin—are non-African American.

41.     On May 6, 2025, McMahon authored an annual review of Dr. Williams's progress for the 2024–2025 academic year, addressed to Valentino. In the review, McMahon admitted that

his report on Dr. Williams's progress "will differ somewhat from the others." The review characterized Dr. Williams's progress as "inadequate" and failing to "meet minimum expectations."

42.     McMahon's characterization was false. McMahon deliberately misrepresented Dr. Williams's scholarly productivity by, among other things: (a) describing a book review accepted for publication in the American Historical Review—the leading journal in the field of United States history—as merely "in preparation," thereby falsely suggesting it was a work-in-progress that had not been submitted; (b) omitting Dr. Williams's accepted and unsolicited essay on the California Gold Rush commissioned through a California National Park grant; (c) omitting that Dr. Williams had received a highly competitive fellowship at the Huntington Library; (d) omitting that Dr. Williams was the most awarded junior faculty member in the department; and (e) failing to acknowledge that Dr. Williams had four articles completed and submitted in the publication pipeline, an unusually high volume of production for a junior faculty member.

43.     McMahon further claimed he could not comment on Dr. Williams's article progress because she did not describe how far advanced her articles were. This was false. Dr. Williams had provided the information, and the Dartmouth Faculty Handbook required only a "snapshot" of research and publishing activities.

44.     McMahon was required by the Dartmouth Faculty Handbook to request a meeting with Dr. Williams to discuss the annual review. McMahon never requested such a meeting, depriving Dr. Williams of any opportunity to correct the misrepresentations before the review was used to justify her termination.

45.     Non-African American junior faculty members were not subjected to similar treatment. On April 9, 2024, Aseel Najib confirmed at a postdoctoral meeting that she had been invited by senior History colleague Udi Greenberg to present her expertise on a panel. On February 19,

11

2025, Najib was invited to showcase her expertise at the Medieval Seminar. On information and belief, Najib had not published a peer-reviewed research article during her postdoctoral period yet was afforded scholarly opportunities denied to Dr. Williams.

46.    On May 23, 2025, senior colleagues in the History Department circulated an email reviving the Comparative Slavery History Reading Group. Dr. Williams, whose dissertation and published scholarship focus on the history of slavery, was not invited. Junior faculty peers Ernesto Mercado-Montero and Aseel Najib, and visiting postdoctoral fellow Charles Baldwin, all of whom are non-African American, were included. Senior faculty members Robert Bonner, Paul Musselwhite, and Roberta Steward extended invitations to non-African American colleagues but did not include Dr. Williams.

### E. Wrongful Termination and Retaliation

47.    On May 28, 2025, Dr. Williams's course was finally approved through Valentino's assistant.

48.    One day later, on May 29, 2025, Dean Smith sent Dr. Williams an email terminating her appointment, stating that her postdoctoral fellowship would not transition into an assistant professor position, effective June 30, 2025. The termination letter was issued at Valentino's recommendation and relied on McMahon's discriminatory annual review.

49.    The termination letter falsely alleged that Dr. Williams had not confirmed her teaching schedule, had not participated in departmental events, and had failed to meet minimum scholarly expectations. Each allegation was false, pretextual, and contradicted by documentary evidence in Dartmouth's possession.

50.    Dartmouth terminated Dr. Williams's appointment without affording her the grievance procedures available to tenure-track faculty under the Organization of the General Faculty of

Dartmouth College, Section 5, and the Agreement Concerning Academic Freedom, Tenure, and Responsibility of Faculty Members. Dr. Williams's male husband, Dr. Marvin Chochotte, had been informed by Dartmouth's Director of Fellowships that postdoctoral fellows with promised tenure lines are "technically" tenure-track professors. Dartmouth denied Dr. Williams this status and the protections that accompany it.

51. The termination letter further stated that Dr. Williams's postdoctoral appointment was being treated as probationary. Dr. Williams's contract contains no such provision. Dartmouth unilaterally imposed a probationary characterization not found in the contract to circumvent Dr. Williams's contractual rights.

**F. Retaliation Connected to Spousal Complaints and Coordinated Pressure**

52. Dr. Williams's husband, Dr. Marvin Chochotte, is an assistant professor in the Department of African and African American Studies ("AAAS") at Dartmouth, a department chaired by Defendant Delmont. Delmont therefore occupied a position of authority over both Dr. Williams (as a senior departmental colleague involved in her course approvals) and Dr. Chochotte (as chair of his department and his dean).

53. On September 24, 2024, at approximately 3:12 p.m., Delmont pressured Dr. Chochotte to cast a vote in the AAAS department on the transfer of senior colleague Laura Edmondson from the Theater Department to AAAS. Dr. Chochotte abstained from the vote. The Dartmouth Faculty Handbook requires that such votes be conducted as confidential, anonymous advisory votes. Delmont conducted the vote openly and non-anonymously, in violation of the Faculty Handbook, and then emailed Dr. Chochotte to pressure him to vote favorably in writing after the vote was complete. Delmont violated AAAS department bylaws governing employment matters. The transfer of a professor into the department constitutes an employment matter under those

bylaws. The AAAS governance bylaws (Administrative Structure), Section II, provide: "In the interest of confidentiality and due to some EOC laws and other actionable concerns, faculty should minimize discussing employment matters over emails."

54.    Delmont's email to Dr. Chochotte disclosed how each AAAS faculty member had voted and stated that every other faculty member had voted in favor of the transfer, creating coercive pressure to conform. On September 30, 2024, Delmont sent a follow-up email demanding that Dr. Chochotte confirm his support by Wednesday so that Delmont could complete the chair letter, even though Dr. Chochotte's vote was not required for that purpose.

55.    Approximately thirty-three minutes after Delmont pressured Dr. Chochotte regarding the vote on September 24, 2024—at approximately 3:45 p.m. that same day—McMahon's department administrator sent Dr. Williams the urgent email pressuring her to rearrange her teaching schedule, as alleged in Paragraph 30. The close temporal proximity between Delmont's pressure on Dr. Chochotte and McMahon's retaliatory pressure on Dr. Williams reflects coordinated conduct by McMahon and Delmont designed to retaliate against both Dr. Williams and Dr. Chochotte simultaneously.

56.    In further retaliation against Dr. Chochotte for abstaining from the vote, the AAAS department unilaterally manipulated Dr. Chochotte's course schedule. On September 26, 2024, the AAAS department administrator prematurely informed Dr. Chochotte that he was "slated" to teach courses in Winter 2025 that he had not confirmed or approved. Dr. Chochotte had previously communicated his preferred courses to the AAAS department administrator and former chair on October 13, 2023. The act of manipulating Dr. Chochotte's course schedule mirrored the simultaneous manipulation of Dr. Williams's course schedule in the History Department and was part of the

14

same coordinated campaign of coercion, intimidation, and retaliation directed at the Williams-Chochotte household.

57.    In December 2024, Delmont sent a text message to Dr. Williams's personal cell phone as part of his campaign to intimidate Dr. Chochotte and to engulf the Williams-Chochotte household in a hostile work environment, as alleged above.

58.    In Winter 2025, Dr. Chochotte was compelled to teach courses he had not approved, including "Black Agrarian Democracy," which Delmont subsequently canceled due to low enrollment. Dr. Chochotte had informed the department a year in advance that he intended to teach "Black Agrarian Democracy" in the Spring term, after first teaching an introductory course to build student enrollment. The department disregarded this plan.

59.    On May 21, 2025, Dr. Chochotte complained to Dartmouth's Board of Trustees and the Dean of Faculty about Delmont's general misconduct, including the vote coercion, course manipulation, and harassment described above.

60.    Approximately one week later, on May 27, 2025, Dr. Williams received McMahon's discriminatory annual review. Two days after that, on May 29, 2025, Dr. Williams received her termination letter. The temporal proximity between Dr. Chochotte's protected complaint and Dr. Williams's termination supports an inference of retaliation.

61.    On information and belief, Defendants coordinated to pressure Dr. Williams as a means of indirectly retaliating against Dr. Chochotte and pressuring both Dr. Williams and Dr. Chochotte to leave Dartmouth. Defendants' conduct constituted third-party retaliation prohibited under Title VII.

62.    On October 27, 2025, the New Hampshire Unemployment Security Office informed Dr. Williams that Dartmouth had reported she was fired due to performance issues. The

15

New Hampshire Unemployment Security Office ruled in Dr. Williams's favor and found no misconduct on her part after examining evidence provided by both parties. Dartmouth's false report to the unemployment office constituted continued retaliation designed to deprive Dr. Williams of unemployment benefits following her wrongful termination.

63.     On May 29, 2025, Dr. Williams disputed the termination, directing her email to the Dean of Faculty, the Chair of the Department, and the Board of Trustees.

## CAUSES OF ACTION

### COUNT I

### *RACE AND SEX DISCRIMINATION, HOSTILE WORK ENVIRONMENT, AND RETALIATION IN VIOLATION OF TITLE VII*

### 42 U.S.C. §§ 2000e et seq.

(Against Dartmouth College)

64.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

65.     Dartmouth is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

66.     Dartmouth discriminated against Dr. Williams on the basis of her race (African American) and sex (female) in violation of 42 U.S.C. § 2000e-2(a) by, among other things: (a) subjecting her to disparate treatment in the annual review process; (b) misrepresenting her scholarly productivity to justify termination; (c) excluding her from departmental events and scholarly opportunities afforded to non-African American junior peers; (d) denying her the grievance procedures afforded to a similarly situated male postdoctoral fellow; (e) terminating her appointment based on false and pretextual grounds; and (f) imposing a probationary characterization on her appointment not found in her contract.

16

67.     Dartmouth subjected Dr. Williams to a hostile work environment on the basis of her race and sex through, among other things: McMahon's paternalistic "father/daughter" framing; McMahon's sexually inappropriate comments; the coordinated campaign of harassing emails and text messages from McMahon, Delmont, and Valentino about questions Dr. Williams had already answered; the deliberate obstruction of her course; and her exclusion from scholarly events in her area of expertise.

68.     Dartmouth retaliated against Dr. Williams for engaging in protected activity, including her objections to discriminatory treatment and her husband's complaint to the Board of Trustees, by terminating her appointment within days of the spousal complaint and by falsely reporting performance-based termination to the New Hampshire Unemployment Security Office. Dr. Williams's termination also constituted unlawful third-party retaliation under Thompson v. North American Stainless, LP, 562 U.S. 170 (2011).

69.     As a direct and proximate result of Dartmouth's violations, Dr. Williams has suffered lost wages, lost benefits, lost career opportunities, damage to her professional reputation, and severe emotional distress.

## COUNT II

### *SEX DISCRIMINATION IN VIOLATION OF TITLE IX*

**20 U.S.C. §§ 1681 et seq.**

(Against Dartmouth College)

70.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

71.     Dartmouth is a recipient of federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681(a).

72.     Title IX prohibits sex discrimination by recipients of federal financial assistance in education programs and activities, including employment.

73.     Dartmouth discriminated against Dr. Williams on the basis of sex in violation of Title IX by: (a) subjecting her to gender-based harassment by McMahon, including paternalistic characterizations and sexually inappropriate comments; (b) denying her the grievance protections afforded to a similarly situated male postdoctoral fellow under identical appointment terms; (c) subjecting her to a coordinated campaign of harassing communications by male administrators and department chairs that compelled her to change her cell phone number; (d) enlisting multiple male administrators to overhaul her approved course and obstruct her contractual teaching obligations; and (e) terminating her appointment on pretextual grounds rooted in gender-based animus.

74.     On information and belief, Dartmouth had actual knowledge of McMahon's discriminatory conduct and the hostile environment, including through the Title IX office, and failed to take prompt and effective remedial action.

75.     As a direct and proximate result of Dartmouth's violations of Title IX, Dr. Williams has suffered lost wages, lost benefits, lost career opportunities, damage to her professional reputation, and severe emotional distress.

## COUNT III

### *CONSPIRACY TO DEPRIVE OF CIVIL RIGHTS*

### 42 U.S.C. § 1985(3)

(Against All Defendants)

76.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

77.    Defendants McMahon, Delmont, Valentino, and Smith conspired with each other and with Dartmouth to deprive Dr. Williams of equal protection and equal privileges and immunities under law, motivated by race-based and sex-based discriminatory animus, in violation of 42 U.S.C. § 1985(3).

78.    In furtherance of the conspiracy, Defendants committed the following overt acts: (a) McMahon authored a deliberately false and misleading annual review designed to manufacture grounds for termination; (b) McMahon and Delmont coordinated to overhaul Dr. Williams's approved course and obstruct her teaching obligations; (c) Delmont tabled Dr. Williams's course approval in the AAAS department to prevent her from fulfilling contractual duties; (d) McMahon, Delmont, and Valentino engaged in a coordinated campaign of harassing communications; (e) Valentino recommended Dr. Williams's termination based on the pretextual annual review; (f) Smith issued the termination letter without affording grievance procedures; (g) Dartmouth falsely reported to the New Hampshire Unemployment Security Office that Dr. Williams was terminated for performance issues; and (h) Delmont pressured Dr. Chochotte regarding the AAAS faculty vote and, within minutes, McMahon's assistant pressured Dr. Williams regarding her teaching schedule, reflecting coordinated retaliatory action targeting both spouses simultaneously.

79.    On information and belief, Defendants' conspiracy was additionally motivated by a desire to pressure Dr. Williams's husband, Dr. Marvin Chochotte, who also held a faculty position at Dartmouth under Delmont's supervision, and to retaliate against Dr. Chochotte's complaint to the Board of Trustees about Delmont's misconduct. Defendants coordinated actions were designed to rid Dartmouth of both Dr. Williams and Dr. Chochotte.

19

80.     As a direct and proximate result of the conspiracy, Dr. Williams has suffered lost wages, lost benefits, lost career opportunities, damage to her professional reputation, and severe emotional distress.

## COUNT IV

### *CIVIL CONSPIRACY*

(Against All Defendants)

81.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

82.     A civil conspiracy exists where two or more persons combine or agree to commit an unlawful act or to commit a lawful act by unlawful means, and an overt act is committed in furtherance of the agreement that proximately causes injury.

83.     Defendants McMahon, Delmont, Valentino, and Smith reached an agreement, express or implied, to engage in the following unlawful acts directed at Dr. Williams: (a) race and sex discrimination in employment; (b) retaliation against Dr. Williams for protected activity and for her husband's protected complaints; (c) breach of Dr. Williams's employment contract through the coordinated manufacture of pretextual grounds for termination; (d) fraudulent misrepresentation of Dr. Williams's scholarly record; and (e) intentional infliction of emotional distress through a sustained campaign of harassment, course obstruction, and professionally destructive conduct.

84.     In furtherance of the conspiracy, each Defendant committed overt acts as described throughout this Complaint, including but not limited to: McMahon's authorship of a deliberately false annual review; McMahon and Delmont's coordinated course obstruction; Delmont's tabling of Dr. Williams's course in AAAS; Delmont's coercion of Dr. Chochotte's departmental vote fol-

20

lowed within minutes by McMahon's retaliatory pressure on Dr. Williams; Valentino's recommendation of termination; and Smith's issuance of the termination letter without affording contractually required grievance procedures.

85. A substantial part of the effects of the conspiracy were felt in the District of Columbia, where Dr. Williams performed her scholarly obligations and received discriminatory and retaliatory communications.

86. As a direct and proximate result of Defendants' civil conspiracy, Dr. Williams has suffered lost wages, lost benefits, lost career opportunities, damage to her professional reputation, and severe emotional distress.

## COUNT V

### *BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING*

(Against Dartmouth College)

87. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

88. Every contract carries an implied covenant of good faith and fair dealing that requires each party to act in good faith and deal fairly, neither doing anything to destroy or injure the right of the other party to receive the benefits of the agreement.

89. Dartmouth breached the implied covenant of good faith and fair dealing by: (a) deliberately obstructing Dr. Williams's ability to fulfill her contractual teaching obligations and then using that manufactured failure as grounds for termination; (b) knowingly misrepresenting Dr. Williams's scholarly record in the annual review to create a false basis for denying her the promised transition to assistant professor; (c) unilaterally imposing probationary terms not found in the contract to circumvent Dr. Williams's contractual rights; (d) denying Dr. Williams grievance

21

procedures that Dartmouth's own policies and established practices afford to similarly situated faculty; and (e) approving Dr. Williams's course one day before terminating her, demonstrating bad faith in the timing and justification of the termination.

90.    As a direct and proximate result, Dr. Williams has suffered lost wages, lost benefits, lost career opportunities, damage to her professional reputation, and severe emotional distress.

**COUNT VI**

***BREACH OF CONTRACT—UNIVERSITY POLICIES AND PROCEDURES***

(Against Dartmouth College)

91.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

92.    Dartmouth's official policies and handbooks—including the Organization of the General Faculty of Dartmouth College, the Agreement Concerning Academic Freedom, Tenure, and Responsibility of Faculty Members, and the Dartmouth Faculty Handbook—constitute part of the contractual relationship between Dartmouth and its faculty members, or in the alternative, create binding obligations enforceable under promissory estoppel or implied contract theories.

93.    Dartmouth breached these policies and the contractual obligations they create by: (a) terminating Dr. Williams without affording her the grievance procedures described in Section 5 of the Organization of the General Faculty; (b) failing to follow the annual review process described in the Faculty Handbook, including the requirement that the department chair meet with the faculty member to discuss the review; (c) unilaterally characterizing Dr. Williams's appointment as probationary when the contract and applicable policies contain no such term; (d) failing to follow established practices for postdoctoral fellows with promised tenure lines, under which such fellows are treated as tenure-track assistant professors, as confirmed by the Director of Fellowships; (e) terminating Dr. Williams's appointment effective June 30, 2025, without following

the standard termination procedures applicable to tenure-track faculty; and (f) conducting the AAAS departmental vote on faculty transfers in an open, non-anonymous manner in violation of the Faculty Handbook's requirement of confidential anonymous advisory votes, as part of the coordinated pressure on Dr. Williams and Dr. Chochotte.

94.　　As a direct and proximate result, Dr. Williams has suffered lost wages, lost benefits, lost career opportunities, damage to her professional reputation, and severe emotional distress.

## COUNT VII

### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

(Against All Defendants)

95.　　Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

96.　　Under the law of the District of Columbia, a plaintiff may recover for intentional infliction of emotional distress where: (a) the defendant engaged in extreme and outrageous conduct; (b) the defendant intended to cause, or recklessly disregarded the probability of causing, emotional distress; (c) the plaintiff suffered severe emotional distress; and (d) the defendant's conduct was the proximate cause of the distress.

97.　　Defendants' conduct was extreme and outrageous. Defendants engaged in a sustained, coordinated campaign over approximately two years to destroy Dr. Williams's academic career through deliberate course obstruction, fabricated performance deficiencies, exclusion from scholarly events in her area of expertise, a barrage of harassing communications that compelled her to change her phone number, a deliberately false annual review designed to manufacture grounds for termination, the approval of her course followed one day later by termination, the denial of contractually required grievance procedures, coercion of Dr. Williams's husband's departmental vote followed within minutes by retaliatory pressure on Dr. Williams, manipulation of

23

both spouses' course schedules, and a false report to the unemployment office designed to deprive her of benefits following her wrongful termination.

98.     Defendants acted intentionally and with knowledge that their conduct would cause severe emotional distress. Each Individual Defendant personally participated in specific overt acts in furtherance of the campaign described above.

99.     As a direct and proximate result, Dr. Williams has suffered severe emotional distress, including anxiety, humiliation, loss of professional identity, and the disruption of her academic career at a critical juncture.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and award the following relief:

A.     Compensatory damages for lost wages, lost benefits, and lost future earnings in an amount to be determined at trial;

B.     Compensatory damages for emotional distress, humiliation, and mental anguish;

C.     Front pay and/or reinstatement to the tenure-track assistant professor position promised under Dr. Williams's appointment letter;

D.     Back pay from June 30, 2025, through the date of judgment, together with prejudgment interest;

E.     A declaratory judgment that Defendants' conduct violated Title VII, Title IX, 42 U.S.C. § 1985(3), and Dr. Williams's contractual rights;

F.     Injunctive relief requiring Dartmouth to implement policies and training to prevent future discrimination and retaliation;

G.     Attorney fees and costs pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k);

25

H.  Pre- and post-judgment interest at the highest rate allowed by law; and

I.  Such other and further relief as this Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands trial by jury on all claims and issues so triable.

(*Signature Page Follows*)

25

Dated: April 29, 2026

Respectfully submitted,

/s/

E. Paige White, DC Bar No. 1719072
EPW Law PLLC
1601 Connecticut Avenue, NW
7th Floor
Washington, D.C. 20009
Phone: (202) 938-0363
Email: paige@epwlawpllc.com

*Of Counsel*
Brent O.E. Clinkscale**
Clinkscale Global ADR
Independent Arbitrator, Mediator, Facilitator
Litigation and ADR Strategic Consultant
Federal ID No 5155
SC Bar No. 008451
5 Crystal Springs Rd. #751
Greenville SC 29615
+1 864.907.2436
brent@clinkscaleglobaladr.com

Clarence Davis**
The Charleston Group
1501 Main Street, Suite 100
Columbia, SC 29201
Main: (803) 799-2500
Direct: (910) 466-6219
Mobile: (803) 606-6309
Fax: (803) 799-2507
cdavis@charlestongroup.com

Timothy Lorick**
The Charleston Group
Post Office Box 1762
Fayetteville, North Carolina 28302
Phone: (910) 485-2500
tlorick@charlestongroup.com


** *Pro hac vice* application forthcoming
*Attorneys for*

26